UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOSE FLORES PALMA,                                      :
                                                        :
                        Petitioner,                     :
                                                        :
            -v-                                         :            25 Civ. 9340 (JPC)
                                                        :
PAUL ARTETA, *et al.*,                                  :            OPINION AND ORDER
                                                        :
                        Respondents.                    :
                                                        :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

In *Chen v. Almodovar*, No. 25 Civ. 9670 (JPC), 2026 WL 100761 (S.D.N.Y. Jan. 14, 2026), this Court addressed whether "an alien who has never been lawfully admitted into this country— but has been living here nonetheless—[is] subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A)" without a bond hearing. *Id.* at *1. This case presents a related question: whether the Fifth Amendment's Due Process Clause requires a bond hearing for an alien who was paroled into the United States and thereafter detained for a prolonged period under Section 1225(b)(2)(A). Like the issue presented in *Chen*, this question has divided district judges. Although many thoughtful jurists have come out differently, this Court concludes that due process does not entitle such an alien to a bond hearing.

## I. Background

### A.    Facts

Petitioner Jose Flores Palma ("Flores"), a citizen of El Salvador, first attempted to enter the United States in July 2022. Dkt. 10 ("Morrow Decl.") ¶¶ 3-4; Dkt. 1 ("Petition"), Exh. B ("Flores Decl.") ¶ 5. After crossing the United States-Mexico border near McAllen, Texas, Flores was stopped by Customs and Border Patrol ("CBP") agents on July 22, 2022, in or around Donna,

Texas.  Flores Decl. ¶ 5; Morrow Decl. ¶ 4.  Flores was then processed for expedited removal and shortly thereafter removed to El Salvador via a charter flight.  Morrow Decl. ¶¶ 5-6; Dkt. 11 ("Return"), Exh. 1 (verification of removal).

Over a year later, on November 9, 2023, Flores presented himself for admission to the United States at the Mexico side of the San Ysidro Port of Entry.  Morrow Decl. ¶ 7; Flores Decl. ¶ 6.  Flores claims that, during an interview that day with CBP, he disclosed that he had been arrested in El Salvador for robbery in 2007.  Flores Decl. ¶ 6.  Despite this purported disclosure, and the fact that Flores "appear[ed] to be inadmissible" under 8 U.S.C. § 1182(a)(7)(A)(i)(I), Return, Exh. 2 (record of inadmissible alien) at 2, CBP granted Flores parole under 8 U.S.C. § 1182(d)(5)(A), Petition ¶ 19, served him with a Notice to Appear ("NTA"), and allowed him into the country, Morrow Decl. ¶ 7.

Although Flores was issued an NTA in November 2023, that NTA was not contemporaneously filed with the Executive Office for Immigration Review ("EOIR").  *Id.*  As a result, removal proceedings against Flores did not commence until December 10, 2024, when the New York City Field Office for Immigration and Customs Enforcement ("ICE") re-served Flores with the same NTA and filed it with the EOIR.  *Id.* ¶ 9; *see* Return, Exh. 3 (NTA dated December 10, 2024).

The Government did not immediately detain Flores after commencing removal proceedings.  But then, on January 8, 2025, ICE obtained documentation indicating that Flores had been convicted of attempted aggravated robbery in El Salvador and sentenced to four years' imprisonment.  Morrow Decl. ¶ 10; *see* Return, Exh. 5 (certificate of release from El Salvador prison).  Just over two months later, on March 31, 2025, Flores was arrested pursuant to Section 235(b)(2)(A) of the Immigration and Nationality Action ("INA").  Morrow Decl. ¶ 11; Flores Decl.

¶ 15; *see* 8 U.S.C. § 1225(b)(2)(A).[1]  Since that arrest, Flores has been detained without a bond hearing at the Orange County Correctional Facility in Goshen, New York.  Morrow Decl. ¶ 11; Flores Decl. ¶ 2.

Flores's removal proceedings have continued while he has been in custody.  At first, on April 15, 2025, the Government moved to dismiss Flores's removal proceedings because, not appreciating that Flores had been paroled in November 2023, it incorrectly assumed that Flores's July 2022 removal order could be reinstated.  Morrow Decl. ¶ 14.  An Immigration Judge ("IJ") granted the Government's dismissal motion on April 24, 2025, *id.* ¶ 15, but after the Government discovered it was not possible to reinstate Flores's prior removal order, Flores and the Government jointly moved on November 14, 2025, for the Board of Immigration Appeals ("BIA") to remand his case to the IJ to continue removal proceedings, *id.* ¶ 20.  Flores's removal proceedings are now pending before the IJ, who has scheduled a merits hearing for March 17, 2026 to consider "Flores's applications for relief from removal."  Dkt. 22 (February 4, 2026 status letter from Flores's counsel) at 1.

**B.    Procedural History**

Flores initiated this action on November 7, 2025, by filing a Petition for Writ of Habeas Corpus against Respondents Paul Arteta, the Warden of the Orange County Correctional Facility; LaDeon Francis, the Acting Field Office Director of the New York Field Office for ICE; Todd M. Lyons, the Acting Director of ICE; Kristi Noem, the former Secretary of the Department of Homeland Security ("DHS"); and Pam Bondi, the Attorney General (collectively, the "Government").  Dkt. 1.  After the Government responded to the Petition on November 19, 2025,

---

[1] At the time of his arrest, Flores was "erroneously issued" a Form I-286 indicating that his detention was pursuant to 8 U.S.C. § 1226(a), as opposed to 8 U.S.C. § 1225(b)(2)(A).  Morrow Decl. ¶ 11; *see* Petition, Exh. F (Form I-286).

Dkts. 9-11, Flores submitted a reply in support of the Petition on November 25, 2025, Dkt. 14 ("Reply").

On December 1, 2025, the Court ordered the parties to submit regular updates on the status of Flores's immigration proceedings, and required the Government to submit a supplemental brief addressing its views on whether the framework from *Matthews v. Eldridge*, 424 U.S. 319 (1976), applies in this case. Dkt. 15. The Government filed that brief on December 5, 2025, Dkt. 17, and Flores responded on December 9, 2025, Dkt. 18 ("Flores Supp. Letter"). The parties have submitted status updates on Flores's immigration proceedings on December 5, 2025, December 19, 2025, January 9, 2026, and February 4, 2026. Dkts. 16, 20-22.

## II. Legal Standard

Under 28 U.S.C. § 2241, a district court may grant a writ of habeas corpus to any person "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Such a petitioner has "the burden of sustaining his allegations by a preponderance of evidence." *Walker v. Johnston,* 312 U.S. 275, 286 (1941). If he makes an allegation of unlawful detention, "and if a dispute as to the facts appears either on the face of the petition and supporting papers or from the facts alleged in the [Government's response]," a district court must "determine whether a hearing is necessary to resolve the dispute." *U.S. ex rel. Holes v. Mancusi*, 423 F.2d 1137, 1141 (2d Cir. 1970). But where, as here, "the record and submissions are adequate to resolve Petitioner's claim," "there is no need for a full evidentiary hearing." *Kaplan v. United States*, No. 14 Civ. 1440 (RMB), 2015 WL 4111246, at *3 (S.D.N.Y. June 25, 2015); *see also Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (discussing a "district court's discretion to choose a middle road that avoided . . . a full testimonial hearing").

### III.  Discussion

Flores's main argument is that his detention for over eleven months without a bond hearing violates the Fifth Amendment's Due Process Clause.  Petition ¶¶ 81-89, 97-99.  But Flores also argues that he may not be detained pursuant to Section 1225(b)(2)(A), Reply at 4-9; that the Government failed to comply with regulations preventing his detention without written notice, Petition ¶¶ 90-93; and that his arrest was an unreasonable seizure in violation of the Fourth Amendment, *id.* ¶¶ 94-96.[2]  The Court begins with Flores's statutory argument, then turns to his due process challenge, and finally, concludes by addressing his remaining arguments.

### A.    Statutory Authority Under the INA

As an initial matter, Flores argues that the Government lacks statutory authority to detain him without a bond hearing.  In his view, the only basis for his detention is 8 U.S.C. § 1226(a), which "operates as a catchall [detention] provision," *Sandoval v. Acuna*, No. 6:25 Civ. 1467 (DCJ), 2025 WL 3048926, at *4 (W.D. La. Oct. 31, 2025), and entitles such aliens to a bond hearing, *see Nielsen v. Preap*, 586 U.S. 392, 397-98 (2019) (explaining that an "alien [under Section 1226(a)] may secure his release if he can convince [a DHS] officer or immigration judge that he poses no flight risk and no danger to the community").  The Government contends, however, that Flores is properly detained pursuant to 8 U.S.C. § 1225(b)(2)(A)—a provision which all agree does not require that an alien receive a bond hearing.

The Court recently resolved a similar dispute regarding the applicability of Sections 1225 and 1226 in *Chen*.  This Section summarizes *Chen*'s holding before explaining why Flores's statutory challenge cannot be distinguished from *Chen*.

---

[2] Flores's Petition also purports to assert a cause of action for "release pending adjudication," Petition ¶¶ 101-105, but this claim merely seeks a remedy—immediate release from custody—for the constitutional and statutory violations alleged in the Petition.

1.    *Chen v. Almodovar*

In *Chen*, this Court addressed whether "an alien who has never been lawfully admitted into this country" is "subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A) or alternatively entitled to a bond hearing under 8 U.S.C. § 1226(a)." 2026 WL 100761, at *1. After "examining the plain text of Section 1225(b)(2)(A) in context of the INA's full statutory scheme," the Court concluded that the statute imposes only two requirements for detention under Section 1225(b)(2)(A): "(1) the noncitizen must be 'an applicant for admission' and (2) 'the examining immigration officer' must determine that the 'alien seeking admission is not clearly and beyond a doubt entitled to be admitted.'" *Id.* at *1, *8 (quoting 8 U.S.C. § 1225(b)(2)(A)). Contrary to how some district courts have interpreted the statute, this Court concluded that there is no separate requirement under Section 1225(b)(2)(A) that the alien be "seeking admission," because "an applicant for admission is someone who, under the statute, is necessarily seeking admission." *Id.* at *8-9.

On the facts presented in *Chen*, both statutory requirements for detention under Section 1225(b)(2)(A) were satisfied. First, the petitioner was an "applicant for admission"—and thus "seeking admission"—because he was "an alien present in the United States who has not been admitted." *Id.* at *13 (internal quotation marks omitted); *see* 8 U.S.C. § 1225(a)(1) (defining an "applicant for admission"). Second, an examining immigration officer had determined that the petitioner was not "clearly and beyond a doubt entitled to be admitted." *Chen*, 2026 WL 100761, at *13 (internal quotation marks omitted). When the petitioner was arrested shortly after crossing the border, a Border Patrol Agent found that he was "inadmissible as an alien who [had] arrived in the United States at any time or place other than as designated by the Attorney General." *Id.* (citation modified); *see* 8 U.S.C. § 1182(a)(6)(A)(i) (applicable grounds for inadmissibility). The Government therefore possessed the statutory authority to detain the petitioner under Section

6

1225(b)(2)(A).  *Chen*, 2026 WL 100761, at *14.

In so ruling, it was "not lost on the undersigned that the overwhelming majority of judges in this District and around the country . . . [had] reached a contrary conclusion."  *Id.* at *1.  But since there continues to be an "absence of precedential authority from the Supreme Court or the Second Circuit," *id.*, the Court has thrice reaffirmed its ruling in *Chen*.  *See Changgeng Chen v. Almodovar*, No. 25 Civ. 9995 (JPC), 2026 WL 507707 (S.D.N.Y. Feb. 24, 2026); *Alvarado Quezada v. Francis*, No. 26 Civ. 387 (JPC), 2026 WL 380711 (S.D.N.Y. Feb. 11, 2026); *Flores Pacheco v. Almodovar*, No. 26 Civ. 640 (JPC), 2026 WL 366994 (S.D.N.Y. Feb. 10, 2026).  In fact, the Court's decision in *Chen* "has only been bolstered by recent persuasive authority from the Fifth Circuit and other judges in this District."  *Changgeng Chen*, 2026 WL 507707, at *3 (citing *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Deras Arana v. Arteta*, No. 26 Civ. 240 (GHW), 2026 WL 279786 (S.D.N.Y. Feb. 3, 2026); and *Weng v. Genalo*, No. 25 Civ. 9595 (JHR), 2026 WL 194248 (S.D.N.Y. Jan. 25, 2026)).

### 2.    Flores's Challenge

Flores's challenge to the Government's statutory authority fails for the reasons explained in *Chen*.  Like the petitioner there, Flores is an applicant for admission because he is "[a]n alien present in the United States who has not been admitted."  8 U.S.C. § 1225(a)(1).  And also as in *Chen*, an immigration officer determined that Flores is not clearly and beyond a doubt entitled to be admitted.  On November 9, 2023, Flores "appear[ed] to be inadmissible" to the inspecting officer, Return, Exh. 2 at 2, as an alien "who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document," 8 U.S.C. § 1182(a)(7)(A)(i)(I) (applicable grounds for inadmissibility).[3]

---

[3] Flores argues that because he was initially issued a Form I-286 in March 2025 indicating that his detention was pursuant to Section 1226(a), *see supra* n.1, this suggests that the Government

In a submission filed after the Court decided *Chen*, Flores argues that his case is distinguishable because he was paroled into the United States, whereas the petitioner in *Chen* was not. Dkt. 22 (February 4, 2026 letter) at 2. But Flores's parole under 8 U.S.C. § 1182(d)(5)(A) does not change his status as an applicant for admission who is not clearly and beyond a doubt entitled to be admitted. Section 1182(d)(5)(A) is explicit that parole "shall not be regarded as an admission of the alien," and that when such parole is terminated, the alien "shall continue to be dealt with in the same manner as that of any other applicant for admission."

The Court therefore finds no basis to distinguish *Chen*. As this Court there ruled, an alien such as Flores, "who has never been lawfully admitted into this country—but has been living here nonetheless—[is] subject to [detention without a bond hearing] under 8 U.S.C. § 1225(b)(2)(A)." *Chen*, 2026 WL 100761, at *1. The Government thus acted within its statutory authority under the INA in detaining Flores without a bond hearing.

## B.    Due Process

Regardless of the Government's statutory authority, Flores's main argument is that his detention is unconstitutional under the Fifth Amendment's Due Process Clause. Flores argues that the Government violated his due process rights by detaining him—even despite his prior release on parole—and thereafter keeping him in custody without a bond hearing for over eleven months. Petition ¶¶ 60-80. Flores insists that due process demands that he receive a hearing at which an IJ determines, on an individualized basis, whether he poses a flight risk or a danger to the community

---

understood his detention to be pursuant to that provision. Reply at 8-9. But the Government has represented to the Court that the Form I-286 was merely "erroneously issued" to Flores. Morrow Decl. ¶ 11. And even assuming that Flores's detention was initially premised upon Section 1226(a), that would not preclude the Government from now relying on the authority of Section 1225(b)(2)(A). In *Chen*, for example, the petitioner was initially detained and released on his recognizance under Section 1226(a), but the Court found no "basis in the INA for the proposition that if an alien is released pursuant to Section 1226, any rearrest must also be made pursuant to Section 1226." 2026 WL 100761, at *14 (citation modified).

such that his continued confinement is justified.

Flores's constitutional challenge requires the Court to consider, *inter alia*, whether an alien's due process rights depend on if he has "entered" the country, whether an alien in Flores's circumstances is considered a non-entered alien, and the extent of due process rights such an alien is entitled to. This Section describes the applicable law and summarizes recent controversy on these issues. The Court then explains why Flores has not entered the country for purposes of the due process inquiry and, as a result, is not entitled to a bond hearing.

### 1. Legal Standard

#### a. The Entry Distinction

Constitutional law has long drawn a "distinction between [the due process rights of] an alien who has effected an entry into the United States and one who has never entered." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). On one hand, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* But on the other hand, "an alien on the threshold of initial entry stands on a different footing" and is entitled to more limited procedural protection. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).[4]

The distinction between the due process rights of aliens who have entered and those who have not tracks a statutory distinction that once existed in immigration law. *See Zadvydas*, 533 U.S. at 693 (explaining that the entry distinction "runs throughout immigration law"). Before 1996, the INA had provided for two kinds of removal proceedings: "exclusion proceedings" and "deportation proceedings." *See Judulang v. Holder*, 565 U.S. 42, 45 (2011). Deportation

---

[4] The entry distinction is closely related to the broader rule, "long settled as a matter of American constitutional law[,] that foreign citizens outside U. S. territory do not possess rights under the U. S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433-34 (2020) (collecting cases).

proceedings were governed by Chapter Five of the INA and applied to aliens who had already entered the United States, whether legally or not. *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). Exclusion proceedings, by contrast, were governed by Chapter Four of the INA and applied to those aliens who had not yet entered. *Id.*

Much like the due process entry distinction, this statutory entry distinction carried great significance—deportation proceedings provided aliens with procedural protections like advance notice, the right to an appeal, and the opportunity to depart voluntarily, all of which were unavailable in exclusion proceedings. *See Landon v. Plasencia*, 459 U.S. 21, 25-26 (1982). Because deportation proceedings offered aliens a comparatively robust set of procedural protections, courts often merged their analysis of whether an alien had "entered" for purposes of the INA with their analysis of whether an alien had "entered" for purposes of the Due Process Clause. *See, e.g.*, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 (1953); *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903). This made sense as a matter of judicial efficiency because if an alien had affected an "entry" for purposes of the INA, then his challenge to detention without a bond hearing, for example, was likely to be successful under the statute regardless of whether he had affected an "entry" for due process purposes.

The statutory entry distinction became less important after Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996. *See* Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996). That law created "a unified procedure, known as a 'removal proceeding,' for exclusions and deportations alike," so a similar process now applies regardless of whether an alien had "entered" or not. *Judulang*, 565 U.S. at 46. But although this change has made the concept of an "entry" less important in the context of the INA, the entry distinction remains important to a constitutional due process analysis. Constitutional decisions continue to heed the "century-old rule regarding the [diminished] due process rights of an alien seeking initial

entry." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020).

### b.    Defining an Entry

Although an alien's entry has long carried great constitutional significance, there is considerable uncertainty about what constitutes an "entry." *See id.* at 192 (Sotomayor, J., dissenting) (explaining that the concept of an entry "relies on a legal fiction"). A complicated set of precedents is the only guidance regarding when an alien has entered and when he has not.

Three sets of cases defining an "entry" are particularly relevant here. First, several decisions make clear that merely "set[ting] foot on U.S. soil" is not enough to enter the United States. *Id.* at 139. For example, an alien has failed to enter when he is detained within the physical boundaries of the United States at Ellis Island, *Mezei*, 345 U.S. at 213, or apprehended after "making it 25 yards into U.S. territory," *Thuraissigiam*, 591 U.S. at 139. The Supreme Court has justified this rule by explaining that the entry distinction "would be meaningless if it became inoperative as soon as an arriving alien set foot . . . [in] an international airport." *Id.* For similar reasons, in the parallel context of the INA, all Courts of Appeals which considered the question before IIRIRA's passage had held that an "entry" under the INA required "freedom from official restraint" *in addition* to physical presence in the country. *See Correa v. Thornburgh*, 901 F.2d 1166, 1171-72 (2d Cir. 1990) (describing the development of this interpretation, and citing *United States v. Vasilatos,* 209 F.2d 195, 197 (3d Cir. 1954), and *Lazarescu v. United States,* 199 F.2d 898, 900 (4th Cir. 1952)).

A second line of caselaw holds that an alien also does not "enter" the United States during a period in which he is paroled into, and thereby permitted to live inside of, the country. The theory behind this rule is that "temporary harborage, an act of legislative grace, bestows no additional rights." *Mezei*, 345 U.S. at 215. So a paroled alien, "although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept

there while his right to enter [is] under debate." *United States v. Ju Toy*, 198 U.S. 253, 263 (1905).

This rule applies even when a paroled alien has been living inside the United States for many years. *See Thuraissigiam*, 591 U.S. at 139 ("[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border." (internal quotation marks omitted)). For example, in *Kaplan v. Tod*, 267 U.S. 228 (1925), an alien had been living in the United States on parole for almost ten years, but the Supreme Court nonetheless held that she had not entered the country. *Id.* at 230; *see also Leng May Ma*, 357 U.S. at 189 (holding that an alien who was paroled into the United States six years prior had not entered the country). As the *Kaplan* Court explained, parole merely meant that the alien's "prison bounds were enlarged," but "the nature of her stay within the territory was not changed." 267 U.S. at 230. "She was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.*

Finally, a third set of relevant cases instructs that the assessment of whether an alien has entered is "unaltered [by] whether he has been here once before or not." *Mezei*, 345 U.S. at 213. In some instances, when a previously-entered alien leaves the country for a brief period, courts have "assimilate[d] [his] status to that of an alien continuously residing and physically present in the United States." *Kwong Hai Chew*, 344 U.S. at 596. But any sort of "protracted absence" creates a "clear break" that requires an alien to enter anew. *Mezei*, 345 U.S. at 214.

### c.    Rights of Non-Entered Aliens

"In evaluating the [fairness of] procedures in any case, [a] court[] must consider the interest at stake for the individual, the risk of an erroneous deprivation . . . , and the interest of the government in using the current procedures." *Plasencia*, 459 U.S. at 34 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)); *see also Black v. Decker*, 103 F.4th 133, 147 (2d Cir. 2024) (similar). For an alien who has not entered the country, however, "it must weigh heavily in

12

the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Plasencia*, 459 U.S. at 34; *see Mezei*, 345 U.S. at 210 ("Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."). Also factoring in the balance is that, on the other side of the scale, courts must consider that a non-entered alien "requests a privilege" and has no "rights regarding his application." *Plasencia*, 459 U.S. at 32; *see Trump v. Hawaii*, 585 U.S. 667, 703 (2018) ("[F]oreign nationals seeking admission have no constitutional right to entry.").

As a result of these unique considerations, proper interest-balancing permits the Government to detain any non-entered alien without bond for a prolonged period. In *Mezei*, for example, the Government did not violate due process by detaining a non-entered alien without a bond hearing for *over three years*—even though there were still no plans to end the alien's confinement or grant him a hearing in the foreseeable future. 345 U.S. at 208 (describing detention beginning in February 1950). *Mezei* is no outlier. *See, e.g.*, *Leng May Ma*, 357 U.S. at 185-86 (rejecting the habeas petition of a non-entered alien who had been detained for over four years). For well over a century, Supreme Court precedents have permitted the lengthy detention of non-entered aliens without a bond hearing. *See Nishimura Ekiu v. United States*, 12 S. Ct. 336, 336 (1892) (Syllabus) (denying due process challenge to alien who had spent over eight months "in the custody of the Methodist Episcopal Japanese and Chinese Mission" without a bond hearing). In reaching these decisions, the Supreme Court did not weigh such factors as the length of detention or whether the alien posed a flight risk. The fact that the alien had not entered was reason enough to permit the Government to not offer a bond hearing. *See Mezei*, 345 U.S. at 212 ("[A]n alien on the threshold of initial entry stands on a different footing[.]").

Because parole is "an act of legislative grace" which "bestows no additional rights," *id.* at

215, the same is true for non-entered aliens who have been paroled.  Just as an alien may be arrested at the border without a bond hearing, so too may the Government revoke an alien's parole without a bond hearing.  *See Ofosu v. McElroy*, 98 F.3d 694, 700 (2d Cir. 1996) ("[An alien's] parole is a matter of the Attorney General's discretion (and of the opinion of those she appoints) and may be ended without hearings or special forms."); *Wong Hing Fun v. Esperdy*, 335 F.2d 656, 657 (2d Cir. 1964) ("There is no basis for appellants' contention that due process requires a hearing on revocation of parole.").  In *Kaplan*, for example, the Government did not need to hold a hearing to establish why it suddenly saw fit to detain an alien who had lawfully been living on parole for almost ten years.  267 U.S. at 230.

The Court stresses that these cases must be distinguished from those pre-1996 decisions which held that any "continuously present resident alien is entitled to a fair hearing when threatened *with deportation*."  *Plasencia*, 459 U.S. at 32 (emphasis added); *see also Kwong Hai Chew*, 344 U.S. at 597-98; *Yamataya*, 189 U.S. at 101.  Those decisions concerned due process in the context of deportation proceedings—as opposed to exclusion proceedings—and thus their holdings do not apply to aliens who have not yet entered the United States.  *See Judulang*, 565 U.S. at 45-46 (explaining the historical distinction between "the exclusion of aliens from admission to this country and the deportation of aliens previously admitted"); *supra* III.B.1.a.

This is not to suggest that there are *no* limits to the Government's treatment of aliens who have not "entered" the country.  The Supreme Court has instructed that any person detained on territory within the United States's "sovereign control" has at least some minimal right to due process.  *Boumediene v. Bush*, 553 U.S. 723, 753 (2008).  For this reason, it was unconstitutional for the Chinese Exclusion Acts to require non-entered aliens to perform a year of "hard labor" as a form of "punishment."  *Wong Wing v. United States*, 163 U.S. 228, 235-37 (1896).  But even with due process protections reaching the Government's treatment of non-entered aliens, the law

is clear that courts cannot sit in review of the Executive's detention of non-entered aliens pursuant to the prescribed process for their removal. *See Demore v. Kim*, 538 U.S. 510, 531 (2003) ("Detention during removal proceedings is a constitutionally permissible part of that process."). In that context, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *see Correa v. Thornburgh*, 901 F.2d 1166, 1171 n.5 (2d Cir. 1990) ("Other than protection against gross physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection.").

## 2.    Recent Controversy

Although these principles were well-established by 1996, courts have had little opportunity to revisit them after Congress passed IIRIRA. That is because IIRIRA revised Sections 1225 and 1226. Section 1226(a) now acts as a catchall provision for detaining any alien and entitles such aliens to bond hearings. *See Sandoval*, 2025 WL 3048926, at *4; *Nielsen*, 586 U.S. at 397-98. Section 1225(b)(2)(A), meanwhile, allows the Government to detain, without a bond hearing, any "alien present in the United States who has not been admitted," 8 U.S.C. § 1225(a)(1) (defining an "applicant for admission"), provided that such alien "is not clearly and beyond a doubt entitled to be admitted," *id.* § 1225(b)(2)(A).

Crucially, for the first three decades after IIRIRA was passed, "successive presidential administrations and many immigration judges treated unadmitted aliens [living inside the United States] as being subject to § 1226(a) rather than § 1225(b)(2)." *Buenrostro-Mendez*, 166 F.4th at 500. And under this nearly thirty-year policy, aliens who had been granted parole were given bond hearings regardless of whether they were entitled to such a hearing as a matter of due process. As a result, few cases tested the limits of whether an alien had "entered" the country or what process was due to non-entered aliens. *But see Thuraissigiam*, 591 U.S. at 107 (holding that an alien who

"attempted to enter the country illegally and was apprehended just 25 yards from the border" had

"no entitlement to procedural rights other than those afforded by statute").

This legal stagnation ended in July 2025, when the Trump Administration "reconsidered

the statutory framework and concluded that aliens who enter the United States without inspection

and admission are subject to mandatory detention under § 1225(b)(2)." *Buenrostro-Mendez*, 166

F.4th at 500. Bond hearings are not provided under Section 1225(b)(2)(A), so the Government

began to argue, for the first time in thirty years, that aliens paroled into the United States are not

entitled to a bond hearing. Many aliens have challenged this Trump Administration policy by

arguing that they may be detained only pursuant to Section 1226(a) and thus are entitled to a bond

hearing under the statute. *Chen*, 2026 WL 100761, at *14. But as is the case here, many have also

argued that they are entitled to a bond hearing as a matter of due process.

In the last few months, thoughtful judges around the country have reached conflicting

conclusions regarding whether due process entitles an alien situated like Flores—who had been

paroled into the United States but was not admitted—to a bond hearing.[5] Although the majority

---

[5] *Compare, e.g.*, *O.F.C. v. Almodovar*, No. 25 Civ. 9816 (LJL), 2026 WL 74262 (S.D.N.Y. Jan. 9, 2026) (lack of bond hearing denied due process), *Campbell v. Almodovar*, No. 25 Civ. 9509 (JLR), 2025 WL 3538351 (S.D.N.Y. Dec. 10, 2025) (same), *Villegas ex rel. Guzman Andujar v. Francis*, No. 25 Civ. 9199 (JLR), 2025 WL 3215597 (S.D.N.Y. Nov. 18, 2025) (same), *Rojas v. Almodovar*, No. 25 Civ. 7189 (LJL), 2025 WL 3034183 (S.D.N.Y. Oct. 30, 2025) (same), *Al-Thuraya v. Warden, Orange Cnty. Corr. Facility*, No. 25 Civ. 2582 (AS), 2025 WL 2858422 (S.D.N.Y. Oct. 9, 2025) (same), *Hyppolite v. Noem*, 808 F. Supp. 3d 474 (E.D.N.Y. 2025) (same), *Salgado v. Francis*, No. 25 Civ. 6524 (VEC), 2025 WL 2806757 (S.D.N.Y. Oct. 1, 2025) (same), *Munoz Materano v. Arteta*, 804 F. Supp. 3d 395 (S.D.N.Y. 2025) (same), *Singh v. Andrews*, 803 F. Supp. 3d 1035 (E.D. Cal. 2025) (same), *Valdez v. Joyce*, 803 F. Supp. 3d 213 (S.D.N.Y. 2025) (same), *Savane v. Francis*, 801 F. Supp. 3d 483 (S.D.N.Y. 2025) (same), *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475 (S.D.N.Y. 2025) (same), *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128 (W.D.N.Y. 2025) (same), *Chipantiza-Sisalema v. Francis*, No. 25 Civ. 5528 (AT), 2025 WL 1927931 (S.D.N.Y. July 13, 2025) (same), *Rodrigues De Oliveira v. Joyce*, No. 2:25 Civ. 291 (LEW), 2025 WL 1826118 (D. Me. July 2, 2025) (same), and *A.L. v. Oddo*, 761 F. Supp. 3d 822 (W.D. Pa. 2025) (same), *with Weng v. Genalo*, No. 25 Civ. 9595 (JHR), 2026 WL 194248 (S.D.N.Y. Jan. 25, 2026) (lack of bond hearing did not deny due process), *Lin v. Almodovar*, No. 25 Civ. 9639 (MKV), 2025 WL 3706626 (S.D.N.Y. Dec. 22, 2025) (same), *Mendez Ramirez v.*

view is that a non-entered alien has a due process right to a bond hearing after prolonged detention, no Court of Appeals has yet to resolve this issue of constitutional law.

### 3.    Analysis

Recognizing the difficulty of the issue presented, the Court concludes that Flores has not entered the United States, and thus has no due process right to a bond hearing while in custody with removal proceedings pending.

As an initial matter, Flores's presence in the United States for two days in July 2022 has no bearing on whether he has now entered the country following his return in November 2023. Although Flores briefly "set foot on U.S. soil" in 2022, that physical presence alone did not change his status, *Thuraissigiam*, 591 U.S. at 139, and even if it did, the sixteen-month period between Flores's removal in July 2022 and his return in November 2023 was a "clear break" which would have reverted his status to that of a non-entered alien, *Mezei*, 345 U.S. at 214.

Nor did Flores enter the United States after being paroled in November 2023. "The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma*, 357 U.S. at 190. It is thus well-established that, "although physically within our boundaries, [a paroled alien] is to be regarded as if he had been stopped at the limit of our jurisdiction." *Ju Toy*, 198 U.S. at 263.

Some district judges have recently concluded, however, that a parolee like Flores, who has "been living and working in the U.S. . . . for nearly two years," stands in a "clearly distinguishable" posture from the non-entered alien in *Thuraissigiam*, "who had barely just crossed the border when he was arrested." *Munoz Materano*, 804 F. Supp. 3d at 415 n.20; *see also Rojas*, 2025 WL 3034183, at *5 (concluding that an alien who was "paroled into the United States [and therefore]

---

*Decker*, 612 F. Supp. 3d 200 (S.D.N.Y. 2020) (same), and *Poonjani v. Shanahan*, 319 F. Supp. 3d 644 (S.D.N.Y. 2018) (same).

at liberty and living an unrestricted life before his arrest" was not "'on the threshold,' except in only the most metaphysical way"). But this supposed distinction finds tension with *Kaplan* and *Leng May Ma*, where the Supreme Court treated paroled aliens as if they were stopped at the border despite their having lived inside the United States for ten years and six years, respectively. *See Kaplan*, 267 U.S. at 230 (holding that an alien living inside the United States on parole for almost ten years had not entered the country); *Leng May Ma*, 357 U.S. at 189 (same with regard to an alien paroled into the country six years prior). If the petitioners in *Kaplan* and *Leng May Ma* had not entered the country by virtue of the length of their paroles, then neither has Flores.

At first blush, it might seem odd to lump together someone like Flores with aliens who have not been inside the United States at all, but this rule has survived for over a century and there is good reason for it. As the Supreme Court observed almost seventy years ago, a rule granting greater rights to parolees than other non-entered aliens "would be quite likely to prompt some curtailment of current parole policy." *Leng May Ma*, 357 U.S. at 190. In other words, if an alien like Flores were afforded greater rights due to the fact that he was paroled, the Government would be less likely to grant him parole in the first place. In that sense, the "entry fiction" that treats parolees as if stopped at the border avoids—not encourages—"needless confinement." *Id.*

Even so, Flores says that his case should be decided in the same manner as *U.S. ex rel. Paktorovics v. Murff*, 260 F.2d 610 (2d Cir. 1958), where the Second Circuit held that a paroled alien was "entitled to the full protection of the constitutional requirements of due process." *Id.* at 614; *see* Petition ¶ 63; Reply at 13. *Paktorovics* involved "special circumstances," however, which made that case "different from other exclusion cases." 260 F.2d at 612, 614. Specifically, the court there held that *Hungarian refugees* who had been paroled were entitled to full due process protections, and did so only because such refugees had been "invited here pursuant to the announced foreign policy of the United States as formulated by [a 1956 Presidential directive]."

*Id.* at 614.  The panel was explicit that "the circumstances under which the Hungarian refugees were paroled into the United States [were] *sui generis*."  *Id.* at 613 (emphasis added); *see also Wong Hing Fun*, 335 F.2d at 657 ("[*Paktorovics*] is confined to its special facts, as the opinion in that case recognized.").  Flores therefore cannot draw any broader rule from the outcome of that highly unique case.

In short, "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (internal quotation marks omitted).  This has two consequences for Flores's challenge.  First, Flores had no right to a bond hearing at the time of his detention. Just as an alien at the border may be detained without a hearing to assess whether he is a flight risk or a danger to the community, Flores too was not entitled to such a hearing before his parole was revoked.  *See Kaplan*, 267 U.S. at 230 (holding that the Government did not need to hold a hearing to establish why it detained an alien who had been paroled for almost ten years); *Wong Hing Fun*, 335 F.2d at 657 ("There is no basis for appellants' contention that due process requires a hearing on revocation of parole.").  Second, Flores also has no right to a bond hearing due to the length of his detention as his removal proceedings have progressed.  In *Mezei*, after all, the Supreme Court held that due process did not require the Government to grant a bond hearing to a non-entered alien who had been detained for over three years without any future plan for release.  345 U.S. at 215. It follows, *a fortiori*, that Flores's detention without a bond hearing for under one year, during the pendency of his removal proceedings, is constitutional.

Recently, some district courts have regarded this conclusion as inconsistent with the entitlement of "all persons *within the territory* of the United States . . . to the protection guaranteed by the Fifth Amendment."  *Rojas*, 2025 WL 3034183, at *4 (citation modified) (quoting *Wong Wing*, 163 U.S. at 238); *see also Al-Thuraya*, 2025 WL 2858422, at *3 ("[T]hese cases [about the

19

entry distinction] don't suggest that applicants for entry are deprived of all protections of the Constitution."). But in fact, the entry distinction precedents acknowledge and account for the fact that non-entered aliens have due process rights, and that the interests of such aliens must therefore be balanced as any other interests would. *See Plasencia*, 459 U.S. at 34 ("[C]ourts must consider the interest at stake for the individual, the risk of an erroneous deprivation . . . , and the interest of the government.").

What explains holdings like *Mezei*, then, is the fact that the Government's interest in not providing a non-entered alien with a bond hearing trumps the alien's right to such a hearing, irrespective of whether that alien appears to pose a flight risk or a danger to the community. In large part, that is because "[t]he Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), whereas a non-entered alien who seeks entry merely "requests a privilege" that is the Sovereign's prerogative to deny, *Plasencia*, 459 U.S. at 32. But even in cases where the balance of interests might seem to favor the non-entered alien's right to release, courts must be mindful that "matters of immigration . . . [are] largely within the control of the executive and the legislature," *id.* at 34, and so "[w]hatever our individual estimate of that policy and the fears on which it rests, . . . courts cannot substitute their judgment for the legislative mandate," *Mezei*, 345 U.S. at 216. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); *Mezei*, 345 U.S. at 210 ("Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.").

Given these unique considerations, the Court is not persuaded by the comparison some courts have made to a criminal defendant's due process right to a parole revocation hearing. *See, e.g.*, *O.F.C.*, 2026 WL 74262, at *8. It is true that in the context of criminal parole revocation, the

Supreme Court has "rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham v. Richardson*, 403 U.S. 365, 374 (1971).  But the situation presented here is different—a non-entered alien's claim to procedural protections is far weaker than that of a criminal parolee, *see Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) ("In the exercise of its broad power over . . . immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."), and a court's role in second-guessing the Government's prerogative is far more tenuous when it comes to matters of immigration, *see Mezei*, 345 U.S. at 216 ("[C]ourts cannot substitute their judgment for the legislative mandate.").  These differences explain why the Supreme Court has continued to reaffirm its entry distinction precedents while also affording criminal parolees a revocation hearing.

Resisting this conclusion, Flores makes two arguments in pursuit of a bond hearing.  First, Flores argues that the aforementioned entry distinction caselaw is inapposite, because (1) his "application is pending in immigration court," so the Government has not definitively denied him entry, Reply at 12; and (2) the entry distinction is relevant only to an alien's "application for admission," but "as to his detention, the Fifth Amendment due process protections apply," Flores Supp. Letter at 1-2.

The Court disagrees with Flores's parsing of the entry distinction precedents.  First, the entry distinction applies regardless of whether the Government has determined that a paroled alien should be excluded.  For example, in *Leng May Ma*, the paroled petitioner was detained without a bond hearing for fifteen months *before* the Government ordered her exclusion.  357 U.S. at 186; *see also Mezei*, 345 U.S. at 208 (explaining that the petitioner was detained for over three months without a bond hearing before being ordered excluded).  Moreover, before IIRIRA was enacted, paroled aliens had their excludability determined in exclusion proceedings, without the benefit of

21

protections like advance notice that "entered" aliens enjoyed in deportation hearings. *See Judulang*, 565 U.S. at 45-46. This treatment was beyond constitutional reproach only because it was well-settled that the entry distinction applied to parolees before they were definitively excluded. *Cf. Plasencia*, 459 U.S. at 32-38 (remanding, in the case of an alien who had affected an entry, for the Court of Appeals to determine whether due process required the protections afforded in a deportation hearing).

Ultimately, a paroled alien is "treated as if stopped at the border," *Mezei*, 345 U.S. at 215, and an alien stopped at the border may be denied certain due process rights regardless of whether he is later allowed to come inside the country. *See Nishimura Ekiu*, 12 S. Ct. at 338-39 (applying the entry distinction to an alien prevented from coming ashore even though that decision had not been "review[ed] by the superintendent of immigration and the secretary of the treasury"). Unsurprisingly, then, over a century of Supreme Court precedents make clear that the entry distinction applies even "while [the] right to enter [is] *under debate*." *Ju Toy*, 198 U.S. at 263 (emphasis added); *Wong Wing*, 163 U.S. at 235 (explaining that an excludable alien may "be held in custody *pending the inquiry* into their true character" (emphasis added)); *see also Ofosu*, 98 F.3d at 700 (applying the entry distinction to alien "who is *awaiting* exclusion proceedings" (emphasis added)).

Second, contrary to Flores's reading of the caselaw, the entry distinction applies with full force in challenges to a non-entered alien's detention. *Mezei*, after all, involved a non-entered alien who sought release from detention on bond, and the Supreme Court rejected his challenge because he was "an alien on the threshold of initial entry." 345 U.S. at 212; *see also Leng May Ma*, 357 U.S. at 186-87 ("Petitioner does not challenge the validity of her exclusion order or the proceedings culminating therein.").

It makes little sense to distinguish the Government's power with respect to a non-entered

alien's "application for admission" from its power with respect to such an alien's detention.  The power to exclude and the power to detain pending exclusion go hand in hand.  *See Demore*, 538 U.S. at 523 ("Congress' power to detain aliens in connection with removal or exclusion is part of the Legislature's considerable authority over immigration matters." (citation modified)).  That is because detention is "part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens."  *Wong Wing*, 163 U.S. at 235.  "Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation."  *Id.*; *see also Demore*, 538 U.S. at 531 ("Detention during removal proceedings is a constitutionally permissible part of that process.").

The fact that Flores is detained under Section 1225(b)(2)(A) further undercuts any supposed distinction between the Government's power to detain and the Government's power to exclude.  Section 1225(b)(2)(A), after all, only allows an alien to "be detained *for a [removal] proceeding*."  8 U.S.C. § 1225(b)(2)(A) (emphasis added); *see Jennings v. Rodriguez*, 583 U.S. 281, 299 (2018) (explaining that Section 1225(b)(2)(A) applies "until removal proceedings have concluded").  Consistent with this limitation, Flores was detained only after the Government initiated removal proceedings, and he remains detained because those proceedings are ongoing.  This is therefore not a case where an alien is facing detention before the commencement of the removal process, or continued detention after the removal process has ended.  *Cf. Zadvydas*, 533 U.S. at 691 ("The civil confinement here at issue is not limited, but potentially permanent.").

In addition to his efforts to narrow longstanding entry distinction precedents, Flores also argues that he is entitled to a bond hearing under the Second Circuit's decision in *Black v. Decker*, which held that "any immigration detention exceeding six months without a bond hearing raises serious due process concerns."  103 F.4th at 150.  Although *Black* did not adopt "a bright-line constitutional rule requiring a bond hearing after six months of detention," it did instruct courts to

balance, on a case-by-case basis, an alien's private interest in being released on bond, the risk of an erroneous deprivation of that right absent a bond hearing, and the Government's interest in not holding such a hearing. *Id.* at 149-50. And in the cases of the two petitioners in *Black*, who were each aliens detained under 8 U.S.C. § 1226(c), the Second Circuit held that a proper balancing of the relevant factors required the Government to provide a bond hearing. *Id.* at 154-55. *Black* did not indicate whether its holding was limited to aliens detained under Section 1226(c)—as opposed to Section 1225(b)(2)(A), or any other detention provision—but Flores maintains that the same result should follow here.

The Court does not, however, read *Black* as upending over a century of Supreme Court precedents which unequivocally hold that "an alien on the threshold of entry stands on a different footing." *Mezei*, 345 U.S. at 212. Although *Black* concluded that a court must balance an alien's interest, the risk of erroneous deprivation, and the Government's interest, that balancing plays out differently for non-entered aliens than it does for those who have already entered. Interest balancing, after all, must consider "the *precise* nature of the government function involved as well as of the private interest that has been affected by governmental action." *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970) (emphasis added) (quoting *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)).

In *Black*, the private interest of the two aliens, who had been admitted as legal permanent residents over a decade prior, was "the most significant liberty interest there is—the interest in being free from imprisonment." 103 F.4th at 151 (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)). By contrast, "[t]he private interest here is not liberty in the abstract, but liberty *in the United States* by someone [not admitted to] this country." *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999). As the Court has explained, *see supra* at III.B.1.c, this interest is far weaker because a non-entered alien has no "rights regarding his application." *Plasencia*, 459 U.S.

24

at 32; *see also Hawaii*, 585 U.S. at 703 ("[F]oreign nationals seeking admission have no constitutional right to entry.").

Another difference is that in *Black*, the Government's interest was merely in "(1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been involved in crimes." 103 F.4th at 153. Here, Flores's detention additionally furthers "[t]he Government's interest in preventing the entry of unwanted persons," which "is at its zenith at the international border." *Flores-Montano*, 541 U.S. at 152. Of course, Flores's immigration proceedings are ongoing, so he may ultimately not be removed, but as the Supreme Court has explained, "[p]roceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character." *Wong Wing*, 163 U.S. at 235. The Government thus has a strong interest—one not present in *Black*—for detaining Flores "while his right to enter [is] under debate." *Ju Toy*, 198 U.S. at 263.

In sum, *Black* presented a different case with different governmental and private interests at stake. *Mezei* and the Supreme Court's entry distinction precedents therefore foreclose Flores's due process challenge. Although Flores is entitled to some minimal amount of due process, the Government's interest in forgoing a bond hearing trumps his interest in receiving one.

## C.    Remaining Challenges

Flores makes two final challenges to his detention, each of which may be briefly disposed. First, Flores argues that the Government acted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), by revoking his parole without written notice. Petition ¶¶ 60, 90-93; *see* 8 C.F.R. § 212.5(e)(2)(i) (requiring "written notice to the alien" upon "accomplishment of the purpose for which parole was authorized or when . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States"). This argument fails for the simple reason that Flores was provided written notice in the form of an NTA. *See* Morrow

25

Decl. ¶ 9 (describing service of the NTA on Flores in December 2024); Return, Exh. 3 (NTA dated December 10, 2024).  Under the applicable regulations, an NTA is a "charging document," 8 C.F.R. § 244.1, which "constitute[s] written notice of termination of parole," *id.* § 212.5(e)(2)(i).

Second, Flores argues that there was no reasonable basis for the Government to revoke parole, and thus that his arrest was an unreasonable seizure which violated the Fourth Amendment. This argument is unpersuasive.  As a threshold matter, it is not clear to this Court that Flores is part of "the people" whose right against unreasonable seizures is protected by the Fourth Amendment.  U.S. Const. amend. IV (protecting "[t]he right of *the people* . . . against unreasonable searches and seizures" (emphasis added)).  "'[T]he people' seems to have been a term of art employed in select parts of the Constitution . . . [to] refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *accord District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) ("[I]n all six other provisions of the Constitution [aside from three provisions that refer to 'the people' in a context other than rights], that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset."); *United States v. Escobar-Temal*, 161 F.4th 969, 1007 (6th Cir. 2025) (Thapar, J., dissenting in part and concurring in the judgment) (concluding that "illegal aliens are not part of the 'political community' and thus not entitled to the same rights as citizens").  But even if Flores could claim Fourth Amendment protection, the Government had legal authority to detain him as a suspected inadmissible alien, which, in itself, makes his arrest reasonable.  *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (holding that the Government may "stop[] or detain[] persons for questioning about their citizenship on [only] a reasonable suspicion that they may be aliens"); *Whren v. United States*, 517 U.S. 806, 818 (1996) ("Where [sufficient individualized suspicion] has existed, the only cases in which we have found

26

it necessary actually to [inquire further into reasonableness] involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests—such as, for example, seizure by means of deadly force.").

## IV.  Conclusion

For the above reasons, Flores's arrest and detention was in accordance with the Constitution, the INA, and the applicable regulation.  Flores's petition for a writ of habeas corpus is therefore denied.  The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: March 12, 2026
    New York, New York

_____
JOHN P. CRONAN
United States District Judge